Filed 6/30/22  P. v. Keaton CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>ANTONIO KEATON,<br><br>    Defendant and Appellant. | B311716<br><br>(Los Angeles County<br>Super. Ct. No. A373350) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Kerry R. Bensinger, Judge.  Affirmed.

Edward H. Schulman, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Scott Taryle, Heidi Salerno and Daniel C. Chung, Deputy Attorneys General, for Plaintiff and Respondent.

—————————————

Antonio Keaton appeals from the denial of his petition for resentencing pursuant to Penal Code[1] section 1170.95. After an evidentiary hearing, the superior court denied Keaton's petition, finding that the People had proved beyond a reasonable doubt that Keaton was the actual killer. The superior court also found, alternatively and independently, that the People proved beyond a reasonable doubt that Keaton was a major participant who acted with reckless indifference to human life. Keaton timely appealed.

On appeal, Keaton makes numerous contentions that the superior court erred in denying his petition because the court relied on inadmissible evidence. His main contention asserts that Sixth Amendment rights attach to a section 1170.95 evidentiary hearing. In related contentions, Keaton specifically challenges the admission of the eyewitness testimony, autopsy report, analyzed evidence report, lab report, fingerprint evidence, police report narrative, and probation report because they were admitted in violation of *Crawford* and *Melendez-Diaz*.[2] In another related contention, Keaton challenges the admission of the preliminary hearing transcripts on the basis that he did not have an opportunity to cross-examine on the issues of major participant and reckless indifference to human life with an interest and motive similar to that at trial. In supplemental briefing, Keaton asserts his contentions of error are further supported by recent legislative changes made by Senate Bill No. 775 (2021–2022 Reg. Sess.) (Stats. 2021, ch. 551, § 2; Senate

[1] All further statutory references are to the Penal Code unless otherwise indicated.

[2] *Crawford v. Washington* (2004) 541 U.S. 36 and *Melendez-Diaz v. Massachusetts* (2009) 557 U.S. 305.

Bill 775), clarifying the scope of admissible evidence at a section 1170.95 hearing. Keaton also argues that the evidence was insufficient to support the superior court's finding of his ineligibility for section 1170.95 relief.

As we discuss, we reject Keaton's main and related contentions that the Sixth Amendment applies at a section 1170.95 evidentiary hearing, we find that Keaton has forfeited his argument regarding the preliminary hearing transcripts, and we find that there is sufficient evidence to support the superior court's finding that Keaton is ineligible for relief pursuant to section 1170.95. Therefore, we do not reach the claims of evidentiary error as they relate to Senate Bill 775. Accordingly, we affirm the superior court's judgment denying Keaton's petition.

## BACKGROUND

### I. Keaton's plea

In 1983, Keaton pleaded guilty to a single count of first degree murder and was sentenced to 25 years to life. As part of the plea agreement, a robbery-murder special circumstances allegation was dismissed. The murder charge arose from a 1981 residential burglary during which 70-year-old Lawrence Mason was robbed and severely beaten. Mason was in a coma for four months before succumbing to his injuries.

### II. The section 1170.95 petition and proceedings

About 36 years later, in 2019, Keaton filed a petition for resentencing pursuant to section 1170.95. In support of his petition, Keaton filed several briefs, attaching, as relevant here, a partial transcript of the August 1981 preliminary hearing

transcript[3] containing testimony of Detective Addison Arce and Officer Michael Albanese, the December 1981 preliminary hearing transcript containing the testimony of Manuel Hernandez, a medical doctor, and Mary Mason[4], the autopsy report, and declarations from Keaton.

The superior court held an evidentiary hearing over several dates from November 2020 to March 2021. At the evidentiary hearing, the following live witnesses testified: Keaton, retired Officer Burton Franks, retired Detective Arce, Detective John Lamberti, and fingerprint examiner Jerome Frietz. In addition to live testimony, the People submitted 33 exhibits and the defense submitted seven exhibits. The superior court reserved ruling on the evidence until after the hearing.

## III. The evidentiary hearing

The following is a summary of the evidence presented at Keaton's evidentiary hearing.[5]

### A. *The robbery-murder*

In 1981, Mason was robbed, his home was burglarized, and he was critically injured, dying from multiple blunt force injuries

---

[3] There were two preliminary hearings conducted below. At the first hearing, Keaton was held to answer on attempted murder. After Mason died, Keaton was held to answer on murder.

[4] Mary Mason was Lawrence Mason's wife.

[5] This factual summary is based on the superior court's memorandum of decision issued March 25, 2021 and our independent review of the record.

four months later.  Keaton, Hernandez, and Steven Green were charged with the crimes.

### 1. Handwritten notes of eyewitness observations

Three neighbors witnessed the initial events:  A.M., A.B., and M.R.  Detective Arce interviewed the witnesses in the hours after the crimes, took contemporaneous notes, and preserved his handwritten notes.  The evidence gathered at the section 1170.95 hearing regarding these neighbors' observations was based on these notes.

A.M. was entering his apartment when he heard loud voices coming from an adjacent apartment.  He looked in that direction and saw a Black male, wearing a dirty tan cap, a grey or blue long sleeve shirt, and blue denim pants.  He also saw a Latino male.  The two men were removing louvered windowpanes from the apartment.  A.M. asked what they were doing.  The Black male responded that his brother was inside, and they wanted to talk to him.  A.M. remarked that their way of entering was unusual, to which the Black male responded again that his brother was in there, and that he was probably sleeping.  A.M. returned to his apartment, and the Black male directed an epithet at him.  A.M. continued to watch the men from his apartment.  He saw another man approach the other two men.  The third man was a Black male, taller and heavier than the other Black male.  This taller, heavier Black male pushed the other two men aside and crawled through the apartment window.[6]  A.M. then called the police.  A.M. then saw the Latino

---

[6] Keaton testified that Green, who is a Black male, about 6 feet 10 inches tall, "big," and "husky."

male enter the apartment through the window. The taller, heavier Black male left the apartment, through the window, after three minutes, and ran off. The shorter Black male entered the apartment through the window. The Latino male also exited the apartment after three minutes. The Latino male acted as if he were the lookout. A.M. never saw the shorter Black male leave the apartment.

A.B. was on his apartment porch when he looked across the street and saw a man removing the louvered windowpanes from an apartment. A.B. described the man as Black, wearing a blue cap, and no shirt. He saw a Latino man standing by. Another man approached, who was Black, taller than the other Black male, and thin. The shorter Black male pushed his way into the apartment through the window. The other two men entered the apartment, stayed inside a few minutes, and left. When the police arrived, A.B. told them the shorter Black man was still inside the apartment.

M.R. saw two men removing windowpanes from the apartment beneath her. One man was Latino. The other man was Black, wearing black pants and a navy blue shirt. The Black man was taking windowpanes out from the window and the Latino man was walking back and forth. The Black man entered the apartment through the window. She heard a scream and a crash from within the apartment. The Latino man left. She did not see anyone else.

### 2. Officer Franks's live testimony

At the section 1170.95 hearing, Officer Franks testified that he arrived at Mason's apartment in response to a call of a

6

burglary in progress.[7]  When the officer was approaching the front door, he saw the door open and a Black male inside.  The two men looked at each other and the Black male slammed the door shut.  Officer Franks heard the lock engage and was unable to open the door.  SWAT team officers set up a perimeter around the apartment to prevent anyone inside from exiting.

### 3. Preliminary hearing transcript:  Officer Albanese

Officer Albanese testified at the first preliminary hearing that for about three hours, a negotiating team tried to contact the intruder by telephone and by bullhorn, but no one responded.  About three hours after police arrived, Officer Albanese entered the apartment.  When he got inside, the apartment looked ransacked.  Mason was lying on the bedroom floor, shaking, bleeding and nonresponsive.  Keaton was "lying unconscious, or appeared to be unconscious, next to the victim."  Officer Albanese then handcuffed Keaton, who appeared to regain consciousness.

### B. *Keaton's booking and interview with Detective Arce*

Detective Arce also testified at the section 1170.95 hearing that he interviewed Keaton at the station and took notes.  Detective Arce testified regarding these statements in part from memory.  In addition, the superior court found that Detective Arce laid the foundation for admission of his handwritten notes of

---

[7] Officer Franks testified that he still recalled this case after almost 40 years because it was so unusual.

that interview pursuant to Evidence Code section 1237, past recollection recorded.

### 1. Detective Arce's present recollection

Detective Arce testified from memory that Keaton said he met Hernandez and Green at a burger stand. They were drinking whiskey together. The three of them drove around in Green's car. At one point, Green got out of the car and took someone's purse. Green also bought marijuana cigarettes and the three continued to drink and smoke. Green asked if Keaton wanted to make some money, and Keaton said he wanted to work. Hernandez also asked Keaton, "You want to make money real quick?" They drove over to an apartment. Green went to the door and knocked on the door. Green hit the resident and then entered the apartment. Keaton was forced into the apartment.

Detective Arce also testified from memory that he went into the apartment shortly after the SWAT team entered, and that Keaton and Mason were alone together in the apartment for three hours.

Detective Arce was present during the prebooking search of Keaton at which two gold metal chains and one ring were found in Keaton's underwear. Later, Keaton told Detective Arce he had been tied up with a four-foot rope.

### 2. Detective Arce's past recollection recorded

Keaton told Detective Arce he was at a burger stand when he met two men: a l7 to 18-year-old Latino man named Manuel Lupes and a 23 to 25-year-old Black man named Slim.[8] They

---

[8] Keaton referred to Green as "Slim" and Hernandez as "Manuel."

8

offered to help Keaton find a job.  Keaton had never seen these two men before.  After drinking whiskey together, all three men got into a car and drove around for 30 minutes.  During this time, Slim took someone's purse.  They returned to the burger stand where they smoked marijuana and continued drinking.  They got back in the car and drove around Hollywood.  According to Keaton, at some point, Manuel asked him, "You want to make money, real quick?"  They drove to an apartment.  Slim went to the apartment and knocked on the door.  A person answered, they spoke, and Slim went inside.  Manuel pushed Keaton inside the apartment.  A lady was watching.  Keaton said he was going to leave, but Slim and Manuel told him to sit down.  Slim started hitting the old man.  Slim and Manuel were both throwing punches at the old man.  Keaton started to leave but Slim started hitting Keaton.  Slim grabbed Keaton around the neck and threw him to the floor.  Slim and Manuel took Keaton into a room and started punching him.  Keaton saw that the old man was lying down with his eyes shut.  Keaton said Slim and Manuel told Keaton to lie down on the bed.  They tied Keaton's hands with a four-foot rope.  They told Keaton not to say anything or they would kill him.  Slim and Manuel left.  Keaton rolled off the bed onto the floor.  He rubbed his hands together and got free. Keaton said he tried to talk to the old man.  As Keaton was about to leave, he fell down.  Keaton said he was yelling for help. Keaton did not know if Slim or Manuel took anything.

Keaton further explained that when the three men approached the apartment, Slim grabbed Keaton and told him to take out the windows.  Keaton said, "No, I don't want to."  Slim said they would kill Keaton if he did not remove the windows. They pushed Keaton through the window.  Keaton saw Manuel

9

and Slim grab the old man.  They asked the man for money and started hitting him.  Keaton also told Detective Arce he had been hit on the head.  Detective Arce felt some lumps on the top of Keaton's head, but Keaton did not request medical attention.

Keaton also said that Manuel had a bag of jewelry, grabbed Keaton's hand, and put a couple of necklaces in it.  Keaton put the necklaces in his pants.  At another point, Keaton said he did not take the jewelry, and he did not know how the jewelry got into his pants.

### C.    *Forensic evidence*

At the section 1170.95 hearing, Detective Arce testified he arrived at the scene after Keaton was arrested.[9]  Detective Arce observed blood on the sofa, in the living room, on the bed in the bedroom, and on the hallway floor between the bedroom and the bathroom.  He also observed "blood splatters throughout the house."  Window panels were missing from a window near the kitchen and a window in the bathroom.  The window panels were not shattered.  He determined the burglar entered the apartment through a louvered window near the kitchen area.  There was no rope found.

In preparation for the section 1170.95 hearing, Frietz, an LAPD forensic print specialist, compared latent fingerprints that were recovered from Mason's bathroom area to Keaton's palm print and Keaton's fingerprints from the automated fingerprint identification system.  At the hearing, Frietz positively identified eight of the latent fingerprints from Mason's bathroom area as being Keaton's fingerprints.

---

[9] Detective Arce also testified that he still recalled the case.

### D. *Hernandez's testimony at the preliminary hearing*

The second preliminary hearing transcript contained Hernandez's testimony. At that hearing, Hernandez testified that on the day of the crimes, he met Keaton at the burger stand. Hernandez had seen Keaton at the restaurant before. Keaton was drunk and asked Hernandez if he was interested in robbing a house. Hernandez agreed and the two of them walked a couple of blocks to a nearby house. When they arrived, the front wooden door was open, but the outside screen door was closed and locked. Keaton used a pen to tear the screen door. While Keaton was tearing the screen, an older White man closed the inside wooden door and said, "Go away." Hernandez and Keaton left. Sometime later, Hernandez and Keaton returned to the house. As they were standing in front of the house, they ran into Green, a friend of Hernandez's. Green and Keaton talked about going into the house; then Keaton approached the house and knocked on the door. The older man said, "Go away or I am going to call the police."

Instead of going away, Keaton went around to the window. Using his hands, Keaton took out some window panels and broke others, leaving blood on his hands. Keaton went inside the house through the window. While Keaton was inside the house, Hernandez paced outside the house. When Hernandez got closer to Mason's front door, he heard hitting noises. He heard the older man say, "Help me! Help me!" and Keaton said, "Shut up." Then, Green went inside the house through the window. After Green was inside for three minutes, Green opened the front door and took off running. Hernandez stood by the open front door for about three minutes. He saw Keaton kick the man in the face,

11

hit the man in the face with his fist, and ask the man for money. Keaton gave Hernandez a watch and asked Hernandez to help him find money. Keaton approached the man again, hit him on the face, and said, "[T]ell me where the money is or I am going to kill you." At that point, Hernandez left with the watch. Hernandez maintained that he stood by Mason's front door during the crime and never went inside the house.

During cross-examination, Hernandez admitted that he gave a statement to the police, lied about his age, and lied about the number of watches he took. Hernandez told the police he was 16 years old and took two watches when in reality he was 14 years old and took one watch. Hernandez testified that he lied about the watches because he believed that he had to talk to the police, or some harm would come to him. An officer told him that if he did not admit to taking and selling two watches, as Green had told the officer, Hernandez "was going to get into more problems."

### E.    *Mary Mason's testimony at the preliminary hearing*

The second preliminary hearing transcript also contained Mary Mason's testimony. At that hearing, Ms. Mason testified that her husband had hip surgery about a year before the crime, that he was able to get around their apartment by holding on to things, and sometimes used a walker. When she eventually went inside her home after the crime, she discovered two of her husband's watches, chains, and a ring were missing. She identified the chains and ring recovered form Keaton's underwear as her husband's jewelry. She also discovered "a hat with a little, like a golf thing and a furry thing" in her garbage disposal.

12

### F. *Keaton's probation report*

In 1983, a probation officer interviewed Keaton in preparation for sentencing and prepared a written report.

Keaton told the probation officer that he met Green at the burger stand on the day of his arrest. He also met Hernandez for the first time that day. On the day of the incident, Keaton was walking down the street when Hernandez called his name. Keaton and Hernandez started eating and talking. Green came over and said, "[L]et's go to work." They got into a car with Green. Previously they had taken some PCP. During the drive, Green got out of the car and returned with a purse. Then Keaton, Green, and Hernandez arrived at a house, and all three exited the car. Green put a knife to Keaton's neck, said, "[B]e cool," and ordered Keaton to remove some windows from the house. Keaton asked if he could leave, but Green refused. Then Keaton and Green entered the house through the window. Green opened the front door and let Hernandez in. Green started hitting the old man. Keaton tried to leave, but Green grabbed him and struck him. The next thing Keaton knew was that "the police came in."

### G. *Keaton's statement to the parole board*

In 2016, Keaton appeared before the parole board and gave a statement about the crime.

At that hearing, Keaton explained that he met Hernandez at the burger stand a couple of days before the crime. Hernandez offered to help Keaton find work. A couple days later, on the day of the crime, Keaton met Hernandez at the burger stand. Hernandez said, "Hey, let's go to my brother's house." The two of them walked to an apartment complex. They were not under the influence of any drugs or alcohol. When they arrived, Hernandez

13

told Keaton that his brother was not home and asked for Keaton's help getting inside. Keaton went over to a window and as he was inspecting it, a neighbor looked at him. In response, Keaton told the neighbor that Hernandez's brother lived there, and he was just helping Hernandez get in.

Keaton then proceeded to take the louvered windows out. He crawled through the window near the dining room and got inside the apartment. As he walked towards the front door to let Hernandez in, an elderly man said, "What are you doing here? Get out of here." Then Keaton opened the front door and tried to leave, but Hernandez and Green, whom he had never seen before, were at the front door, so Keaton tried to exit through the window, but someone grabbed him from the back and hit him on the head, knocking him unconscious. He woke up in a police car. He did not know how the jewelry got into his underwear.

### H. *Keaton's declaration*

Keaton submitted a declaration for the section 1170.95 hearing that included the same facts that he provided at the parole board hearing.

### I. *Keaton's testimony at the evidentiary hearing*

Keaton testified at his section 1170.95 evidentiary hearing. On direct examination, he testified to the same facts he provided at the parole board hearing. During cross-examination, when confronted with his statements to Detective Arce in 1981, he denied making nearly all of those statements.

He stated that when he was arrested and taken to the station, he did not have any injuries or blood on him. He also discussed what clothing he was wearing before and after the crime.

14

**J.** *The superior court's evidentiary rulings*

The superior court admitted the following evidence without objection: transcripts of both preliminary hearings, the transcript of Keaton's plea, Keaton's declaration, and photographs and diagrams of the crime scene.

The superior court admitted the following evidence over the defense objection:[10] a partial transcript of parole board suitability hearing, autopsy report, portions of the probation report, portions of the police report narrative, Detective Arce's handwritten notes of a recorded interview with Keaton, Detective Arce's handwritten notes of interviews with witnesses A.M., M.R., and A.B., DOJ live scan, Keaton's rap sheet, analyzed evidence report, booking form, property report, laboratory report, latent fingerprint cards, and Keaton's palm prints.

**K.** *The superior court's ruling on the petition*

The superior court denied Keaton's petition in a 33-page memorandum of decision, finding that the prosecution established beyond a reasonable doubt each element of first degree murder pursuant to the felony-murder rule under the newly amended sections 188 and 189. The superior court also found, on an alternative and independent basis, that the

---

[10] The superior court analyzed the admissibility of the contested evidence based on its interpretation of the meaning of "new or additional evidence" in former section 1170.95, subdivision (d)(3). The superior court relied on *People v. Williams* (2020) 57 Cal.App.5th 652 and *People v. Hall* (2019) 39 Cal.App.5th 831, using the analytical framework of "reliable hearsay" to determine the admissibility of the evidence. Given our conclusion in this case, we do not reach whether *Williams* and *Hall* survive the Legislature's recent amendments to section 1170.95, subdivision (d)(3).

prosecution had proved beyond a reasonable doubt that Keaton was a major participant in the underlying felony and acted with reckless indifference to human life.

In denying Keaton's petition for relief, the superior court found Hernandez's preliminary hearing testimony "far more credible" than Keaton's and "sufficiently credible to carry the People's burden of proof." The superior court found that Keaton was not a credible witness, observing that Keaton's various statements were inconsistent and, in some respects, implausible.[11]

The superior court found that the evidence established beyond a reasonable doubt that Keaton was the actual killer. In coming to this conclusion, the superior court relied on Hernandez's testimony, which was admitted through the preliminary hearing transcript. The superior court noted that Hernandez's testimony was corroborated by the eyewitness testimony, the testimony of Detective Arce, and the fingerprint evidence.

As an alternative and independent basis for denying the petition, the superior court conducted an analysis pursuant to *People v. Banks* (2015) 61 Cal.4th 788 and *People v. Clark* (2016) 63 Cal.4th 522 on the issue of whether Keaton was a major participant in the underlying felony and acted with reckless indifference to human life. In conducting the analysis, the superior court reasoned that "even if [it] were to discredit Hernandez's testimony entirely, stripping away his direct

_____

[11] The superior court found Keaton's claim that he did not know the two gold chains and the ring were in his underwear incompatible with the physical reality of wearing underwear.

16

testimony that the burglary/robbery was Keaton's idea and that Keaton was the actual killer, and credit Keaton's testimony that he did not strike Mason, the People have proved beyond a reasonable doubt that Keaton was a major participant . . . and acted with reckless indifference to human life."

## DISCUSSION

Keaton makes numerous contentions on appeal that the superior court erred in denying his petition because the court relied on inadmissible evidence. Keaton also contends that insufficient evidence supports the superior court's finding that he was a major participant who acted with reckless indifference to human life. [12]

---

[12] Keaton also contends that the parole transcript and probation reports were erroneously admitted because they are not part of the record of conviction. The People contend that this argument is flawed because even under former section 1170.95, subdivision (d)(3), the prosecutor and the petitioner were permitted to rely on "the record of conviction *or offer new or additional evidence* to meet their respective burdens." We agree. To the extent that Keaton can be understood to claim that it was error to consider the parole hearing transcript and probation reports under the newly amended language of Senate Bill 775, we do not reach that contention as we explain.

Keaton further claims that his due process and equal protection rights were violated. While Keaton offers us a brief explanation of the concept of equal protection, he provides little to no analysis of these claims. These claims fail for lack of adequate argument and authority. (See *Imagistics Internat., Inc. v. Department of General Services* (2007) 150 Cal.App.4th 581, 593 [claim that administrative remedy violated federal

## I.     Overview of section 1170.95

Effective January 1, 2019, Senate Bill No. 1437 (2017–2018 Reg. Sess.) (Stats. 2018, ch. 1015, § 1; Senate Bill 1437) amended murder liability under the felony-murder rule and natural and probable consequences doctrine.  (*People v. Lewis* (2021) 11 Cal.5th 952, 957; *People v. Gentile* (2020) 10 Cal.5th 830, 842–843.)  As relevant here, Senate Bill 1437 amended the felony-murder rule by adding section 189, subdivision (e), which now provides that a participant in the perpetration of qualifying felonies is liable for felony murder only if the person:  (1) was the actual killer; (2) was not the actual killer but, with the intent to kill, acted as a direct aider and abettor; or (3) was a major participant in the underlying felony and acted with reckless indifference to human life, as described in section 190.2, subdivision (d).  (*Gentile*, at p. 842.)

Senate Bill 1437 also added section 1170.95, which created a procedure whereby persons convicted of murder under a now-invalid felony-murder theory may petition the superior court to vacate the murder conviction and resentence the petitioner on any remaining counts.  (*People v. Lewis, supra,* 11 Cal.5th at p. 959; *People v. Gentile, supra,* 10 Cal.5th at p. 843.)

As relevant here, Senate Bill 775, which took effect on January 1, 2022, amended section 1170.95 to address the scope of admissible evidence at the evidentiary hearing.  As amended, section 1170.95, subdivision (d)(3) provides, in relevant part: "The admission of evidence in the hearing shall be governed by the Evidence Code, except that the court may consider evidence

---

supremacy clause failed for lack of adequate argument and authority].)

18

previously admitted at any prior hearing or trial that is admissible under current law, including witness testimony, stipulated evidence, and matters judicially noticed.  The court may also consider the procedural history of the case recited in any prior appellate opinion.  However, hearsay evidence that was admitted in a preliminary hearing pursuant to subdivision (b) of Section 872 shall be excluded from the hearing as hearsay, unless the evidence is admissible pursuant to another exception to the hearsay rule.  The prosecutor and the petitioner may also offer new or additional evidence to meet their respective burdens."

## II.  The Sixth Amendment right to confrontation does not attach to a section 1170.95 evidentiary hearing

Keaton contends that he is entitled to the same rights as a defendant facing a new criminal prosecution.  Because he was denied those rights, he asserts the evidence against him was admitted in violation of the Sixth Amendment.  The People assert that the retroactive relief afforded by section 1170.95 is an act of lenity by the Legislature that is not analogous to a criminal trial and does not implicate Keaton's constitutional trial rights.  We agree with the People.

The Sixth Amendment of the United States Constitution guarantees that "[i]n all criminal prosecutions," the accused has the right "to be confronted with the witnesses against him."  The confrontation clause therefore bars the "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." (*Crawford v. Washington*, *supra*, 541 U.S. at pp. 53–54; see *People v. Sanchez* (2016) 63 Cal.4th 665, 680.)

19

While the "Sixth Amendment applies '[i]n all criminal prosecutions[,]' [Citation.] [a] petition under section 1170.95 is not a criminal prosecution." (*People v. Silva* (2021) 72 Cal.App.5th 505, 520.) Thus, appellate courts consistently have held that the " 'retroactive relief provided by section 1170.95 reflects an act of lenity by the Legislature "that does not implicate defendants' Sixth Amendment rights." ' " (*Ibid.*; accord, e.g., *People v. James* (2021) 63 Cal.App.5th 604, 610 [convicted person litigating § 1170.95 petition does not enjoy rights that Sixth Amendment guarantees to criminal defendants who have not yet suffered final conviction]; *People v. Perez* (2020) 54 Cal.App.5th 896, 908, review granted Dec. 9, 2020, S265254 [Senate Bill 1437 not subject to Sixth Amendment analysis]; *People v. Anthony* (2019) 32 Cal.App.5th 1102, 1156 [relief afforded by Senate Bill 1437 "constituted an act of lenity that does not implicate defendants' Sixth Amendment rights"].)

Although Senate Bill 775 amended section 1170.95, subdivision (d)(3) to clarify the scope of evidence admissible at an evidentiary hearing, in so clarifying, it did not provide the petitioner with the right to confront witnesses at that hearing. There is nothing in the language of the amended statute to suggest that the Legislature intended for the admission of evidence at the hearing to be subject to the confrontation clause.

Both *Crawford* and *Melendez-Diaz* concerned the admission of testimonial hearsay against a defendant *at a criminal trial*. (*Crawford v. Washington*, *supra*, 541 U.S. at pp. 53–54 [admission of testimonial statements of witness not appearing at trial violates defendant's confrontation rights unless witness is unavailable to testify and defendant had prior opportunity for cross-examination]; *Melendez-Diaz v. Massachusetts*, *supra*,

557 U.S. at pp. 310–311 [extending *Crawford*'s holding to forensic reports].)  Section 1170.95 is an optional postconviction resentencing procedure.  "A person convicted of [enumerated qualifying offenses] *may* file a petition."  (§ 1170.95, subd. (a), italics added.)

Accordingly, the Sixth Amendment right of confrontation does not apply at a section 1170.95 evidentiary hearing and the evidence admitted against Keaton was not admitted in violation of the holdings of *Crawford* and *Melendez-Diaz*.[13]

## III.  Keaton has forfeited any objection to the admission of the preliminary hearing transcripts

In a related contention, Keaton argues that the preliminary hearing transcripts should not have been considered by the superior court because Keaton did not have a similar motive and

---

[13] Keaton also argues that the statements he made at the parole board hearing should not have been admitted against him because such admission runs contrary to the right against self-incrimination.  He cites to *People v. Coleman* (1975) 13 Cal.3d 867, 874–878, in which our Supreme Court held that a defendant's testimony at a probation violation hearing is inadmissible as substantive evidence in a subsequent criminal trial on the criminal charges.  As we have explained, a hearing pursuant to section 1170.95 is not a criminal trial.  As such, it does not implicate a defendant's constitutional rights under the Fifth Amendment.  (See *People v. Myles* (2021) 69 Cal.App.5th 688, 705–706; *People v. Anderson* (2022) 78 Cal.App.5th 81.)

We also reject Keaton's claim that he is entitled to a jury determination on the issues of major participant and reckless indifference to human life.  There is nothing in the language of the amended statute that remotely suggests that the Legislature intended that factfinding be determined by a jury at a section 1170.95 hearing.

opportunity as at trial to cross-examine the witnesses, because the elements of major participant and reckless indifference to human life were not relevant to the magistrate's decision. Keaton argues that any objection to the admission of the preliminary hearing transcripts below would have been futile. The People contend that Keaton has forfeited this claim because not only did Keaton fail to object below, he was the one who moved the preliminary hearing transcripts into evidence. We agree with the People.

A party is not permitted to challenge an evidentiary ruling based upon an argument never presented to the superior court. (*People v. Partida* (2005) 37 Cal.4th 428, 435–438.) A "challenge to the admission of evidence is not preserved for appeal unless a specific and timely objection was made below." (*People v. Anderson* (2001) 25 Cal.4th 543, 586; Evid. Code, § 353, subd. (a).)

At the evidentiary hearing, Keaton moved the first and second preliminary hearing transcripts into evidence which the superior court admitted. In fact, they were labeled as defense exhibits. After the evidentiary hearing, Keaton submitted briefing on his evidentiary objections, which did not include objections to the preliminary hearing transcripts.

Keaton not only failed to object below to the preliminary hearing transcript, on any grounds, but importantly, he was the party who offered both preliminary hearing transcripts as evidence.[14] Accordingly, Keaton has forfeited this claim. In any

---

[14] There may be strategic reasons why Keaton may have wanted the preliminary hearing transcripts admitted. It appears that Keaton may have offered the preliminary hearing

22

event, this contention is rooted in the assumption that the Sixth Amendment applies here, and as previously discussed, it does not.

## IV. Substantial evidence supports the superior court's finding that Keaton is ineligible for relief pursuant to section 1170.95

The People argue that even assuming the superior court erred in admitting the evidence at issue, any error was harmless under *People v. Watson* (1956) 46 Cal.2d 818, because the superior court's ruling did not require relying on any of the contested evidence, and substantial evidence supports the finding. Keaton contends that if the erroneously admitted evidence is set aside, the remainder is insufficient to support the superior court's finding that Keaton was a major participant and showed reckless indifference to human life.

Assuming, arguendo, the superior court erred in admitting the evidence as argued by Keaton, reversal is not required unless it is reasonably probable Keaton would have obtained a more favorable outcome had the evidence been excluded. (*People v. Watson*, *supra*, 46 Cal.2d at p. 836.) We review the court's determinations at the section 1170.95, subdivision (d)(3), evidentiary hearing for substantial evidence. (*People v. Clements* (2022) 75 Cal.App.5th 276, 298.)

---

transcripts, and Hernandez's testimony in particular, in order to serve as a foil to Keaton's own testimony. In closing argument, Keaton, through his counsel, argued his own testimony at the section 1170.95 hearing was truthful and honest, whereas, in contrast, the cross-examination of Hernandez at the preliminary hearing revealed so many inconsistencies that Hernandez was not to be believed whatsoever.

### A. *Major participant*

In determining whether a defendant is a major participant in an underlying felony pursuant to section 189, subdivision (e), we look to *People v. Banks*, *supra*, 61 Cal.4th 788. *Banks*, at page 794, considered "under what circumstances an accomplice who lacks the intent to kill may qualify as a major participant." Our Supreme Court listed various factors that should be considered: "What role did the defendant have in planning the criminal enterprise that led to one or more deaths? What role did the defendant have in supplying or using lethal weapons? What awareness did the defendant have of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants? Was the defendant present at the scene of the killing, in a position to facilitate or prevent the actual murder, and did his or her own actions or inactions play a particular role in the death? What did the defendant do after lethal force was used?" (*Id.* at p. 803.) "No one of these considerations is necessary, nor is any one of them necessarily sufficient." (*Ibid.*)

Here, considering only Keaton's testimony at his section 1170.95 hearing, the live testimony of percipient witnesses Officer Franks and Detective Arce, including Keaton's statements to Detective Arce after his arrest—evidence that has not been contested in this appeal—substantial evidence supports several of the *Banks* factors. First, by his own admission, Keaton was present at the scene and admitted to being inside. He removed the louvered windows from Mason's apartment. Keaton testified that he tried to leave the apartment, but that he was knocked unconscious, and the next thing he remembered was being in a patrol car. However, Keaton was impeached with his

24

statements to Detective Arce. In the statement he gave to Detective Arce, Keaton went inside the apartment and witnessed the beating. Further, Officer Franks's live testimony established that Keaton was present and aware inside the apartment. Officer Franks made eye contact with Keaton at the front door, after which Keaton slammed the door shut. Unconscious people do not slam doors. When the police finally entered the apartment, only Keaton and Mason were inside. Mason's jewelry was found in Keaton's underwear, which supports the conclusion that Keaton participated in the crimes. Once inside, Keaton would have immediately recognized the particular dangers of the crime. Not only was Mason home, but he was a frail 70-year-old man. After the lethal force occurred, Keaton remained inside the apartment for about three hours. During this time, he was not only a major participant, he was the only participant. He could have helped, but he did not. As to Keaton's claim that he was tied up with a rope, Detective Arce testified that no rope was found at the scene. This supports the conclusion that Keaton was in a position to prevent the murder yet did nothing. Moreover, Keaton actively prevented the police officers from helping Mason. He closed the front door on Officer Franks, prompting Officer Franks to request the SWAT team. Then, for the next three hours, Keaton ignored the officers' many attempts to communicate with him. Even after the police arrested him, he continued to thwart police efforts by feigning unconsciousness and lying about the underlying events. Although there was no evidence regarding Keaton's role in planning the felony, and no evidence about Hernandez's and Green's past experiences and Keaton's knowledge of those past experiences, nonetheless,

substantial evidence exists to support the superior court's finding that Keaton was a major participant.

**B.** ***Reckless indifference to human life***

In determining whether a defendant displays reckless indifference to human life pursuant to section 189, subdivision (e), we look to *People v. Clark, supra*, 63 Cal.4th 522. Reckless indifference to human life is " 'implicit in knowingly engaging in criminal activities known to carry a grave risk of death.' " (*Id.* at p. 616.) Recklessness has both a subjective and an objective component. Subjectively, the defendant must consciously disregard risks known to him. Objectively, recklessness is determined by "what 'a law-abiding person would observe in the actor's situation,' " that is, whether defendant's conduct " 'involved a gross deviation from the standard of conduct that a law-abiding person in the actor's situation would observe.' " (*Id.* at p. 617.)

*Clark* listed factors to consider when determining whether reckless indifference existed: "Did the defendant use or know that a gun would be used during the felony? How many weapons were ultimately used? Was the defendant physically present at the crime? Did he or she have the opportunity to restrain the crime or aid the victim? What was the duration of the interaction between the perpetrators of the felony and the victims? What was the defendant's knowledge of his or her confederate's propensity for violence or likelihood of using lethal force? What efforts did the defendant make to minimize the risks of violence during the felony?" (*In re Scoggins* (2020) 9 Cal.5th 667, 677 [summarizing *Clark* factors].) As with the major participant considerations, " '[n]o one of [the reckless indifference] considerations is necessary, nor is any one of them necessarily

26

sufficient.' " (*People v. Clark, supra*, 63 Cal.4th at p. 618.) "We analyze the totality of the circumstances to determine whether [the defendant] acted with reckless indifference to human life." (*Scoggins*, at p. 677.)

Here, again only considering Keaton's testimony at his section 1170.95 hearing, his statements to Detective Arce, and the live testimony of percipient witnesses Officer Franks and Detective Arce, substantial evidence supports several of the *Clark* factors. It is true that there is no evidence that weapons were involved in Mason's murder. However, Keaton was present at the scene and did nothing to prevent the beating. As discussed above, Keaton removed the louvered windows, went inside, and stayed inside. Once inside, Keaton witnessed Mason's beating, did nothing to intervene, remained inside after Hernandez and Green left, and stayed inside for three hours while police were attempting to communicate with him. Three hours provided Keaton with plenty of time to appreciate Mason's condition. For three hours, Keaton prevented the police from coming to Mason's aid. Though Keaton claimed he was unconscious during that time, the testimony of Officer Franks completely contradicts that claim, as does the jewelry found in his underwear. Officer Franks's live testimony established that he made eye contact with Keaton at the front door, after which Keaton slammed the door shut. This is strong evidence that Keaton was not unconscious, and thus was in a position to appreciate Mason's critical condition. Officer Franks would have no reason to call for the SWAT team if he believed the only individuals inside the apartment were unconscious and injured. When the police finally entered the apartment, only Keaton and Mason were inside. Thus, substantial evidence existed to support the superior court's

27

finding that Keaton acted with reckless indifference to human life.

In sum, we are satisfied that, even without considering the challenged evidence, substantial evidence supports the superior court's finding that Keaton was a major participant who acted with reckless indifference to human life.  Thus, Keaton has not met his appellate burden of showing prejudicial error.

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED.

KIM, J.[*]

We concur:

LAVIN, Acting P. J.

EGERTON, J.

_____

[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.